**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TERI LOGAN-GATES,** | ) | |
| **ID# 1114137** | ) | |
| **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:08-CV-1683-B (BH)** |
| | ) | |
| **NATHANIEL QUARTERMAN, Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the Court, this case has been referred for findings, conclusions, and recommendation.

## I.  BACKGROUND

On or about September 23, 2008, petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §§ 2254 challenging his conviction for capital murder in case F-201077-UR. Respondent is Nathaniel Quarterman, Director of TDCJ-CID.

### A.  Factual History

The State indicted petitioner for the capital murder of D.G., a child under six years of age, alleged to have occurred on or about February 7, 2001.  (Trial Transcript:2).  After petitioner pled not guilty to the charged offense, on July 8-19, 2002, she was tried before a jury.  The evidence presented at trial, as recounted by the state appellate court, was as follows:

> On February 5, 2001, Robert Franklin, a Lancaster fire fighter and EMT, was driving an ambulance and received a call that there was an injury at an address in Lancaster.  When Franklin arrived, he got out of the ambulance and saw appellant holding a baby, D.G., and walking toward him.  As Franklin approached appellant, she turned away and started to go back inside her apartment.  Franklin approached appellant and took D.G. from her.  D.G. was naked and unconscious, her breathing was shallow and slow, and she was not responsive.  Franklin noticed D.G. was dry.

Franklin went to the back of the ambulance and laid D.G. on a stretcher to let the paramedics on the scene take over treatment.  Although Franklin palpated the back of D.G.'s head, he did not feel any trauma.  Appellant was "hanging on the back doors of the ambulance pretty hysterical."  Franklin got out of the ambulance and asked appellant what had happened.  Appellant said she was giving D.G. a bath and took her out of the bathtub, stood her up, and told her to stay "right there."  Appellant left the room and returned to find D.G. had fallen.  Appellant then called 911.

D.G. was taken to Children's Medical Center (Children's) where Julia McDonald, a pediatric emergency medicine physician, examined her.  D.G. was not breathing well and was in "somewhat of an unstable condition," with altered mental status and declining heart rate.  McDonald put a tube down D.G.'s throat to assist her breathing and sent her to the CT scanner and the intensive care unit.  The CT scan revealed a "pretty intensive skull fracture" that, McDonald testified, was not consistent with a slip and fall in the bathroom.  D.G. was treated for her injuries but died on February 7, 2001.

Donna Persaud, a pediatrician at Children's Referral and Evaluation of Abused Children program, examined D.G. and reviewed her CAT scan.  The scan showed D.G. had fresh blood between the halves of her brain and a skull fracture in the back of her head.  From this, Persaud concluded D.G. had suffered high-force head trauma and significant force injury to the nerve cells in her brain.  Persaud testified that the explanation offered for D.G.'s injuries, that she fell from her own height, would not explain the level of trauma that she suffered.  Instead, Persaud testified, D.G.'s brain and never cell injuries were consistent with D.G.'s head moving with speed and rotation and suddenly being stopped against a hard surface or with D.G. being shaken violently.  After D.G.'s death, Persaud reviewed the autopsy report which showed that at least a portion of D.G.'s skull fracture had occurred a week or two before her death.  However, Persaud testified that this indication of prior injury added to her diagnosis of abusive head trauma because abusive injuries tend to be repeated and escalating.  Persaud testified D.G. could have suffered a portion of her skull fracture eight days before her death, but it was not medically plausible that D.G. could have "been normal for days" after suffering brain injury resulting in blood between the hemispheres of her brain and unconsciousness.

Jennie Duval, a forensic pathologist who conducted an autopsy on D.G., testified D.G.'s nerve fibers were injured.  Duval testified that, if D.G. had fallen eight days before her death, she would have died then and would not have been "walking around asymptomatic."  According to Duval, simply jerking a child down to make her sit down, even if she struck her head on an object in that motion, is not enough force to cause the shearing in the brain.  Duval testified that children under the age of three are very susceptible to shearing injury that can occur when they are shaken.  A child's brain is extremely soft and is not set in the skull; thus, the brain can move back and forth more readily than an adult's brain, creating a greater risk

for a shearing injury.

Randall Alexander, a pediatrician in Atlanta, Georgia, testified D.G. had retinal hemorrhages in both eyes consistent with D.G. being shaken repetitively and with "quite a lot of force." The retinal hemorrhages were tested and determined to be fresh on February 5, 2001. Presented with the scenario of a minimal prior fracture of D.G.'s skull followed by a second impact resulting in a more complex fracture, Alexander testified that such a scenario would fit better with a clinical history that showed the child was a "pretty sick" child with "a whole lot of symptoms" following the initial fracture. Alexander testified that, in his opinion, the first force was not nearly what the second force was because the second force created "big time brain injury."

David Dolinak, Dallas deputy chief medical examiner, testified he was working in Miami, Florida at the time of D.G.'s autopsy, but he reviewed the autopsy records and determined D.G.'s death was a homicide caused by blunt force injury. Dolinak testified that D.G.'s CT scan at Children's an hour and a half after her injury did not show any significant brain swelling. However, Dolinak testified, it was not brain swelling that made D.G. go unconscious after her injury but injury to the brain tissues themselves and damage to the nerve cells in her brain. Dolinak testified that, in his opinion, the nerve cell damage was not caused by any previous skull fracture because the nerve damage would have caused unconsciousness or unresponsiveness for a long time following the injury. Further, the bleeding over the surface of D.G.'s brain was recent and indicated nerve cell damage. There was evidence of prior bleeding associated with a prior fracture, but that was in a very small area and did not contribute in any way to D.G.'s death, according to Dolinak.

In contrast, Vincent DiMaio, the chief medical examiner in San Antonio, testified he reviewed the autopsy report and tissue slides and photographs of D.G. taken at the time of the autopsy. DiMaio testified he would not rule D.G.'s death a homicide and could not testify it was a homicide. According to DiMaio, the cause of D.G.'s death was the initial injury that occurred a week to two weeks before her death. The autopsy revealed both recent and old bleeding and a fracture that was one to two weeks old. When the lining covering the inside of the brain was examined, it showed blood both on the inside and outside of the lining and evidence of "organization," that the body was healing. This evidence was also from one to two weeks old, indicated bleeding inside and outside the lining one to two weeks prior to death. DiMaio testified the skull was weakened by the initial fracture, and because of this, any minimum trauma to the head could cause injury to the brain or rebleeding or push the bone into the brain. In D.G.'s case, DiMaio testified, the initial fracture was "significant" and "severe" because it caused bleeding both inside and outside the lining, and the re-injury appeared relatively minor. DiMaio testified there was no doubt D.G. had a fracture that was one to two weeks old, and taking that into account, there was no way to say the more recent fall produced death.

DiMaio testified D.G.'s death was not a baby shaking case because shaking a baby would break its neck, not cause a skull fracture, which would require an impact. Further, DiMaio testified D.G. developed an inability to coagulate her blood while she was in the hospital and received transfusions that did not help the blood to clot and rendered her highly susceptible to bruising. Concerning the blood on D.G.'s brain, DiMaio testified the second impact caused rebleeding but did not necessarily cause the initial fracture to increase. Children with very bad head injuries could seem to be normal, according to DiMaio. When the second impact caused additional bleeding in D.G.'s brain, that led to retinal hemorrhage as well.

John Plunkett, a forensic pathologist, also testified that D.G.'s death was caused by the original head injury. However, Plunkett testified that an impact in the bathtub or falling outside the bathtub could cause significant injury in and of itself. A fall backward from a height of approximately twenty inches could have caused D.G.'s initial fracture and injury, Plunkett testified. The bleeding underneath the lining inside the brain cavity was the important factor in this case, Plunkett testified, because that bleeding showed there was brain damage resulting from the initial skull fracture.

D.G.'s father, Darren Graham, testified he and appellant went to Oklahoma on Friday, January 26, 2001, to look at houses. D.G. stayed with her grandmother, Marsha Graham. On Saturday, January 27, Graham called Marsha, who said D.G. had fallen off the back porch. Marsha handed the phone over to D.G.'s grandfather, who told Graham that, right after the fall, D.G. lay on the ground without moving or breathing but she recovered. Graham and appellant returned to Dallas late that night and picked up D.G. the next day. Graham testified D.G. did not "act like herself," did not play around like she normally did, and acted like she had the flu. She vomited several times and did not eat much. Graham testified D.G. was taken to the doctor on Monday, January 29. [sic][1] After D.G.'s death, Graham testified he was angry with his mother and father "because I knew my daughter was injured over there." Graham did not find out, however, that part of D.G.'s skull fracture was old until approximately seven months after her death when the report was released.

Appellant testified that she and Graham went to Oklahoma to look at houses, Graham heard in a phone call to his mother that D.G. had fallen off a porch but was okay, and appellant and Graham picked up D.G. on Sunday, January 28. According to appellant, D.G. was acting "worn out," when they picked her up, and during the week that followed D.G. slept a lot, would not play, and vomited. One day appellant

---

[1] Darren Graham actually testified that his mother took his daughter to the doctor on February 5th. (R. 7:43-4, 84). It was undisputed at trial that that was the only time anyone took D.G. to the doctor in the days prior to her admittance to the hospital. Marsha Graham and the nurse practitioner and nurse who saw D.G. testified that she was diagnosed with an ear infection in both ears. (R. 4:161–65; 180; R. 5:156). The nurse practitioner and nurse also testified that she acted normally and showed no neurological problems. (R. 4:167-172, 182-85).

and D.G. were picking up toys, and D.G.'s hand/eye coordination was "kind of off." Appellant asked D.G. if she was sick, but D.G. crawled up on the couch and sat there for the rest of the evening. D.G. went to day care that week with Linda Gust. Gust told appellant that D.G. had thrown up and "wasn't playing right." On February 3, D.G. said "Hurt, mamma," while rubbing the back of her head. Appellant examined D.G.'s head but found no bumps, scratches, or bruises. D.G. pointed to her heart and to her stomach or toes and said, "Hurt," but appellant could find nothing wrong. Graham was present during this incident, and D.G. finally got up and sat on the couch and watched television.

During the week preceding her death, D.G. stood up in the bath every time appellant tried to wash her hair. When appellant rubbed shampoo in D.G.'s hair, D.G. leaned forward "like she was getting away," but there were no marks on her. D.G. would also try to get away from the towel when appellant dried her hair after a bath. On Monday, February 5, Marsh [sic] took D.G. to the doctor, who diagnosed D.G. with two inner ear infections. When appellant came home from work, she bathed D.G. together with appellant's nearly one-year-old son from a previous relationship. Appellant thought the ear infections explained why D.G. had started standing up in the bath. When D.G. stood up in the bath that evening, appellant tried to get D.G. to sit down and gave her a "swat to like get her attention." Appellant testified the swat "wasn't very hard at all." Appellant put her hand on D.G.'s hip and "tugged her down." At the same time, D.G. was sitting down, and D.G. "went back and hit her head." Appellant testified D.G. hit her head on the soap dish or around the soap dish. After she hit her head, D.G. leaned forward and said, "Hurt, mamma," while touching the back of her head. Appellant examined D.G.'s head but found no marks. Appellant told D.G. she was sorry, but D.G. "had to sit down and take a bath." Appellant testified she did not force or slam D.G.'s head into the soap dish or any other surface.

Appellant took her son into the living room, put him on the floor, and gave him cookies. While she was doing this, appellant left D.G. alone in the bath for approximately five minutes. Appellant returned to the bath and finished washing D.G. and tried to play with her, but D.G. "just wasn't acting herself." Just as she stood D.G. up outside the tub, appellant heard what she thought was her son coughing or choking. Appellant told D.G. to "stay right there" and went into the living room and got the cookie out of her son's mouth. Appellant heard "a loud noise in the bathroom like a thunk,"'and she ran to the bathroom. She discovered D.G. lying on the floor a few inches from the tub. D.G. was not moving, and her breathing was shallow. Appellant picked up D.G. and carried her to her bedroom where she noticed D.G. was not breathing. Though she did not know CPR, appellant gave D.G. "a couple of mouth-to-mouth like breaths." Appellant started "freaking out" and ran into the living room where she called 911.

*Logan-Gates v. State*, No. 05-02-01624-CR, slip op. at 1-8.

Evidence was also presented at trial that D.G. was twenty-three months old when she died. (R. 3:75; R. 7:30-2, 35). Various statements petitioner made to authorities regarding what occurred the evening of February 5, 2001, were also presented. At the scene, petitioner told one of the EMTs who responded to the scene that she had been bathing D.G., took her out of the bathtub, stood her up, told her to stay still, left the room, and returned to find that D.G. had fallen. (R. 3:53). At the hospital, petitioner completed an affidavit stating that she had been bathing D.G. and her nine-month-old son, and that she took the baby into another room and dried him off, leaving D.G. in the bathtub. She then returned and finished bathing D.G., heard a noise and went to check on it, heard D.G. fall over, and found her unconscious on the floor. (R. 3:249, R. 4:212). On February 8, 2001, petitioner wrote a statement during an interview with police officers from the Lancaster Police Department. She wrote that she stood D.G. on the floor in the bathroom to check on a noise coming from her son, she heard a loud thunk from the bathroom, and when she returned D.G. was laying one or two inches from the tub at an angle on her back. (R. 3:254-255; R. 11:State's Ex. #4). None of the statements given at the scene, at the hospital, or at the police station on February 8, 2001, mentioned D.G. falling in the bathtub.

On the morning of February 9, 2001, petitioner returned to the police department at the request of the investigating officers. (R. 3:263). After being informed of the preliminary autopsy results, and being read her *Miranda* rights, petitioner wrote a statement. (R. 3:139-59). She claimed that D.G. stood up in the bath because she hated having soap in her eyes. Petitioner gave her a swat and took her hip to make her sit down, and when she sat down she fell back and hit the back of the tub where the soap dish was pretty hard. She also wrote that D.G. started playing with her toys but acted tired. Petitioner got the baby out of the tub, took him into the living room, came back and finished bathing D.G., and picked her up out of the tub. Petitioner then heard a noise from the baby,

left D.G. to check on him, heard a thunk, and went back to the bathroom to find D.G. on the floor. She wrote that it slipped her mind to mention the fall in the bathtub earlier because D.G. seemed fine, if a little tired.  (R. 11:State's Ex. #2).  After being confronted again with the injuries found during the autopsy, petitioner wrote another statement that afternoon.  There, petitioner wrote that she put her hand on D.G.'s hip and "yanked" her down to the tub and that she hit the back of her head on the soap dish. (R. 11:State's Ex. #3).  Darren Graham testified that petitioner did not tell him prior to giving her statements on February 9 that D.G. had fallen and hit her head on the soap dish. (R. 7:100).  Petitioner never mentioned to the police officers any fall by D.G. before February 5 when asked how to explain the injuries. (R. 3:199).

Moreover, while the fact that D.G. had a prior skull fracture was not disputed by the experts at trial, it was a contested issue whether or not the fracture occurred at her grandparents' house.  As noted earlier, Darren Graham testified at trial that he called his parents on January 27, 2001, when he was with petitioner in Oklahoma at her parents' house, and his parents told him that D.G. had fallen off of their porch that day and that she had not breathed for a moment, but was alright.  He also testified that he took his mother's cell phone with him and used that phone to call them.  (R. 7:35-6, 68-9).  Darren never told the police about this fall because they would not have believed him (R. 7:67, 106). Petitioner testified at trial that she overheard Darren's side of this conversation, and petitioner's father, Terry Gates, testified that Darren told him about the conversation about the fall. (R. 8:97-8, 218-19 ).  Darren's brother, Milton Graham, testified that he came home to his parents' home on January 27, 2001, and was told that D.G. fell off the porch that day and had been still for a few moments before beginning to move again.  (R. 8:41).  He acknowledged, however, that he did not tell the police this information until June of 2002. (R. 8:38-40).

Darren also testified at trial that petitioner spanked D.G. on her bare bottom at one point

7

because she had gotten into some medicinal cream, and this spanking left bruises on her bottom. (R. 8:10-11). He also testified at trial that he gave a statement to the police after they told him that petitioner's story did not explain D.G.'s injuries. It stated that petitioner told him on two occasions that she was jealous of the bond between him and his daughter D.G., and that she would sometimes say that she was going to boot the children out the door if they did not mind her. (R. 7:57). Darren Graham also wrote in this statement and testified at trial that petitioner loved D.G., played with her, and was good with children. (R. 7:54-5).

Darren's parents, Marsha and Burl Graham, both testified at trial and denied that D.G. fell off their porch in January of 2001and denied that they ever told Darren this. They instead testified that she fell off the porch in October of 2000, but did not hit her head, and that she fell in front of their house on February 5, 2001, but again did not hit her head. (R. 6:164-69, 200-02, 229-34). The Grahams testified that they did tell Darren about the October fall and that he would take his mother's cell phone with him when he went on trips to Oklahoma. (R. 6:205, 234). Burl Graham further testified that Milton Graham made up the story about a fall in January because he was angry that they made him move out of their home after he began receiving disability payments. (R. 9:21-3).

The State also presented evidence from two co-workers regarding statements petitioner made to them. Bonnie Bankston Brazier testified that she worked with petitioner during the summer of 2000, and that she would return to the workplace after the summer ended to visit with her mother, who also worked there. Brazier testified that petitioner was the front-desk receptionist and that Brazier would chat with her from time to time. After petitioner began dating Darren Graham, petitioner commented that she did not like D.G. and that D.G. "got on her nerves" because she would whine and cry for her father and wanted her dad's attention. Petitioner further stated to Brazier that she could not stand D.G. at all, and that she did not like little girls, perhaps because she

8

grew up with boys.  Brazier further testified that every time petitioner talked about D.G., it was negative, but she would never speak about her own son that way.  When petitioner would get frustrated at work, she would clinch her fists and act angry. (R. 3:208-11, 222).  Brazier did not, however, believe that petitioner would intentionally kill D.G.  (R. 3:216).

Claire Ashford testified that she also worked with petitioner.  In October of 2000, petitioner told her that she had spanked D.G. for getting on her couch with her shoes on.  Ashford responded that it was petitioner's responsibility to take the child's shoes off, and petitioner responded that D.G. was going to mind her while she was in her house.  Ashford also believed that petitioner could be a jealous person.  (R. 3:231-34).

The babysitter who cared for both D.G. and petitioner's baby testified that petitioner had a good relationship with D.G. and was affectionate with her.  (R. 6:241.)  Petitioner's parents, Terry and Vicki Gates, the pastor of petitioner's church, Joe Oldham, and several members, including Charlie and Charlotte Blanford and Barbara Ortiz, also testified similarly.  (R. 8:24-5, 53, 61-2, 67, 217, 224).

The jury found petitioner guilty, and because the State did not seek the death penalty, she was automatically sentenced to life imprisonment. (Tr.:4, 112).

**B.  Procedural History**

On direct appeal, petitioner raised twenty-four points of error, including challenges to the legal and factual sufficiency of the evidence to support the conviction.  Petitioner's conviction was affirmed on appeal and her petition for discretionary review was refused.  *Logan-Gates v. State*, No. 05-02-01624-CR (Tex. App. – Dallas, Jan. 6, 2005, pet ref'd).

Petitioner filed a state habeas application on November 20, 2006. (State Habeas Transcript:2).  The trial court held a hearing on the state application on May 25, 2007, and a

deposition of another witness who could not attend the hearing was taken on June 12, 2007. (S.H.Tr.:168-255, 263-81).  The trial court then made findings recommending that relief be denied. (*Id*. at 328-60).  On September 17, 2008, the Court of Criminal Appeals denied relief on the basis of the findings without a written order  (S.H.Tr.:cover).

On September 23, 2008, petitioner filed her petition for federal habeas relief.  Respondent filed a response on January 21, 2009, and provided the state court records.  No reply brief was filed.

## C. Substantive Issues

Petitioner claims that she is being held unlawfully because:

1) his trial counsel and appellate counsel were ineffective;

2) her jury was unconstitutionally selected; and

3) there is no evidence to support the verdict.

Pet. at 6, 8-9.

## II. EXHAUSTION

Respondent contends that petitioner has failed to exhaust her third ground for relief. Respondent argues that the claim of "no evidence" is unexhausted and procedurally barred. Respondent also argues that the claim lacks merit.  Because it appears that petitioner is entitled to no habeas relief on the allegedly unexhausted claim, the Court bypasses the procedural issue and proceeds to the merits of the claim.  *See* 28 U.S.C. § 2254(b)(2) (providing that  the Court may deny a habeas petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998) (reaffirming pre-AEDPA law that "when, as in this case, exhaustion is not waived, courts have the 'discretion in each case [under § 2254(b)(2)] to decide whether the administration of justice would be better served by insisting on exhausting or by reaching the merits of the petition forthwith'"); *Braswell v.*

*Dretke*, No. 3:02-CV-0342-M, 2004 WL 2583605, at *4 (N.D. Tex. Nov. 12, 2004) (findings, conclusions, and recommendation which recognizes that "the district courts may deny habeas relief for procedurally defaulted claims" in lieu of deciding the issue of procedural bar), *accepted by* 2005 WL 1058865 (N.D. Tex. May 2, 2005).

### III.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).  Here, the denial of petitioner's state writ constitutes an adjudication on the merits of the claims fairly presented to the Texas Court of Criminal Appeals in such writ.  The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply to the claims raised in petitioner's federal petition.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In her first ground for relief, petitioner asserts that her trial counsel was ineffective for failing to question three witnesses who testified for the defense about their knowledge of a fall that occurred at Marsha and Burl Graham's house on January 27, 2001. Petitioner also asserts that trial counsel was ineffective for failing to call two additional witnesses regarding D.G.'s behavior during the week before her death and about petitioner's relationship with her.

To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the defi-

cient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Petitioners must "affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are also insufficient to obtain habeas relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

## A.  <u>Failure to Call Witnesses regarding Fall</u>

First, petitioner contends that her trial counsel was ineffective for failing to question three defense witnesses about their knowledge of D.G.'s alleged fall off her grandparents' back porch in

January 2001.  These witnesses were the grandparent's next -door neighbor, Charlie Blanford, another neighbor, Teresa Ricosi, and Barbara Ortiz.[2]

###### 1.      State Habeas Proceedings

During the state habeas proceedings, petitioner's state counsel submitted several affidavits as support for his claim that trial counsel was ineffective for failing to call certain witnesses and ask certain questions.  In his affidavit, Blanford stated that he was Burl and Marsha Graham's next-door neighbor.  One day in late January of 2001, when Darren and petitioner were in Oklahoma, Darren called him and told him that his parents had reported that D.G. had fallen off of the porch at their house.  Blanford also stated that he recalled the Grahams acknowledging a fall, but they did not go into much detail about it. (S.H.Tr.:64).  In her affidavit, Ortiz stated that in January or February of 2001, she was at the Blanford house when Burl came over, alone and "drinking as usual," acting nervous and confused, and said that D.G. had fallen from what she understood to be his back porch. (S.H.Tr.:47).  Ricosi's affidavit stated that one day in January of 2001 she was at the Blanfords' house with Ortiz when Burl Graham came over and told them that D.G. had fallen off the porch. (S.H.Tr.:50).

At an evidentiary hearing, Ricosi testified that she grew up with Marsha Graham and that she later lived down the street from the Grahams. (S.H.Tr.:179).  When Burl came over to the Blanfords' house, it was a Saturday afternoon and Darren and petitioner were in Oklahoma.  Burl asked Charlie and Charlotte Blanford, Ortiz, and herself if they knew how to contact Darren and petitioner because D.G. had fallen off the porch and lost her breath.  (S.H.Tr.:181).  She further testified that Blanford went back to the house with Burl Graham to check on D.G. and then came back and called Darren and petitioner himself.  (S.H.Tr.:182).  On cross-examination, Ricosi stated that she did not know anything about Marsha Graham loaning Darren her cell phone when he went

---

[2]  In these affidavits and in the transcripts of the hearing and deposition, some of the names are spelled differently than they were in the trial transcript, such as "Darrin" Graham, "Birl" Graham, and "Thresa Rakoczy."  For the sake of clarity, the Court will continue to use the spellings that were used at trial.

to Oklahoma and had no answer for why, if that were true, Burl Graham would need to ask other people how to reach Darren. (S.H.Tr.:192-93).

At her deposition, Ortiz testified that she was living with the Blanfords on the day of the funeral. Burl Graham came over to the Blanfords' house, sat down at the table with her and Blanford, and stated that he did not know what he was going to do because he knew what had really happened to D.G. (S.H.Tr.:268). He then referred to D.G. falling off of their porch but said that if he talked about it he would get in trouble with Marsha, and he stated that he felt sorry for petitioner. (S.H.Tr.:268). Ortiz had known petitioner from church for five or six years, well before she began dating Darren, and petitioner was the one who introduced her to the Blanfords. (S.H.Tr.:274-75). On cross-examination, Ortiz testified that she did not think to specify in her affidavit that the day she referred to was the day of the funeral, but she was aware that D.G. died in February. She conceded that her memory was better when she gave the affidavit than in the deposition and that the affidavit was signed in November of 2006. (S.H.Tr.:280).

All three of these witnesses also stated in affidavits and testified that they informed petitioner's attorney about their knowledge of this fall, but were not questioned on this subject at trial. (S.H.Tr.:65, 189-90, 272-73). Petitioner's attorney, Roy Merrill, testified at the evidentiary hearing that he forgot to question them on this issue because he was so intent on refuting the claim made by Marsha Graham that D.G. had become afraid of petitioner. (S.H.Tr.:222-24).

The trial court made factual findings based on the affidavits and live testimony. The trial court found that Ricosi was not an impartial witness at the writ hearing and that she displayed animosity towards Marsha and Burl Graham and a bias in favor of petitioner. The trial court compared Ricosi's testimony at the writ hearing with Blanford's affidavit that states Darren called and told him that D.G. had fallen off of the back porch with Darren and Marsha Graham's testimony at trial that Darren took Marsha's cell phone when he went to Oklahoma, and found that Ricosi's testimony was not credible or worthy of belief. (S.H.Tr.:335). The trial court also found that no one informed hospital personnel or the police at the time of any prior fall and found that there was a

statement in Dr. Persaud's history of D.G. that "No trauma incidents could be recalled by either parent." (S.H.Tr.:335-36, 339). The trial court then found that trial counsel's focus on disproving Marsha Graham's testimony about D.G. being fearful of petitioner was a reasonable trial strategy and concluded that his representation of petitioner was not constitutionally ineffective in this respect. (S.H.Tr.:336-37, 340, 360).

Alternatively, the trial court found that the evidence of a prior skull fracture was undisputed by either party, that the State's experts testified that the prior fracture did not significantly contribute to D.G.'s death, and that all of the State's experts testified that it was the blow or blows D.G. received on February 5, 2001, that caused her traumatic brain injury. (S.H.Tr.:337, 340). The trial court then found that the jury, in judging the credibility of the witnesses, was not persuaded that it was the older fracture that was the actual cause of death. It therefore concluded that petitioner had failed to prove that her counsel was ineffective. (S.H.Tr.:340, 360).

2.    *Strickland Standard*

Petitioner has not rebutted the presumption that the trial court's findings are correct by clear and convincing evidence. She has not shown under § 2254(d)(2) that the state court's decisions in these cases were based on an unreasonable determination of the facts in light of the evidence presented in the state court. Finally, the state court's decision is not an unreasonable application of the *Strickland* standard. *See* 466 U.S. at 687.

a.    *Deficiency*

First, petitioner has not overcome the "strong presumption" that counsel's conduct in failing to call these three witnesses was not deficient. *See Strickland*, 466 U.S. at 689. Regarding Teresa Ricosi's testimony at the writ hearing, the trial court's finding that her testimony is not credible is a reasonable factual determination based on the evidence in the record. At trial, Detective Andrews of the Lancaster Police Department testified that he interviewed Ricosi about a fall D.G. took at her grandmother's house earlier in the day on February 5, 2001, took a statement from her and Marsha Graham about this fall that she witnessed, and determined that this fall was not a contributor to the

child's death because she fell on gravel or pavement outside of the house. (R. 3:269, R. 4:46-7). Then, Ricosi testified at trial that she lived two doors down from the victim's grandparents and that she saw D.G. fall face-first on February 5, 2001, in front of her grandmother's house, but that it was too far away to see if she had hit her head.[3]  Ricosi also testified that D.G. was crying and holding the back of her head.  Ricosi acknowledged on cross-examination that when she gave a statement to a police officer about this fall, she told him that D.G. fell forward with her hands in front of her and did not mention her holding the back of her head.  Ricosi also admitted that D.G. did not hit the back of her head during this fall and that her grandmother picked her up.  (R. 8:30-34).  Petitioner also testified that she overheard Ricosi telling either the doctors or the police at the hospital about the fall D.G. took on February 5. (R. 8:182).

Not only does Ricosi's writ testimony contradict Darren and Marsha Grahams' testimony at trial that he borrowed her cell phone and therefore would be easily reachable in case of an emergency, it contradicts Darren and petitioner's testimony that Darren called home and was told about the fall as well as Ricosi's own actions in this case.  It is simply not believable that Ricosi would have failed to tell the authorities about another fall D.G. took while in her grandmother's custody in light of the detail she provided at the writ hearing about how "hateful" Marsha Graham acted towards and about her granddaughter, even though she only saw the two of them together when they were outside in the yard of Marsha Graham's house. (S.H.Tr.:186-88, 193-94).  The trial court's determination that defense counsel was not ineffective for failing to question Ricosi on this subject is not an unreasonable application of the *Strickland* standard.

With regard to Ortiz, her testimony at her deposition and her statements in her affidavit were not the same.  She testified at her deposition that Burl talked about this fall on the day of the funeral, but in her affidavit she stated that he made these statements in January or February of 2001, without any mention of the day of the funeral in particular.  Moreover, she testified that Blanford was present

---

[3]     After returning to Marsha Graham's house after the visit to the medical clinic on February 5, 2001, D.G. tripped and fell forward in the driveway, hurting her knee. (R. 6:167).

when this statement was made, but Blanford says nothing about this particular meeting in his affidavit and only states that he recalled both Burl and Marsha both admitting to him that a fall had taken place at their house.  Ortiz' testimony at her deposition is inconsistent with Ricosi's testimony because Ricosi testified that Ortiz was present when Burl Graham came over looking to reach Darren in Oklahoma, whereas Ortiz made no reference to this occurrence and instead testified that she and Blanford were present when Burl Graham admitted that the fall had occurred.

Regarding Blanford's affidavit, he states that Darren called him and told him about the fall and that Burl and Marsha Graham later acknowledged that D.G. had fallen off of the porch.  The first statement would have been both hearsay and cumulative of Darren's testimony that Darren told Blanford and others about the fall. (R. 7:68).  The second statement, while not inconsistent with other testimony given at trial about the fall, is vague with no specifics given about where and when the Grahams acknowledged the fall.  Moreover, as noted earlier, the Grahams did not dispute that D.G. had fallen off of their porch.  They instead disputed that the fall occurred in January of 2001.  While Blanford's affidavit is meticulous in other respects, it mentions nothing about Burl Graham visiting his home alone on the day of the funeral and confessing to the fall, a conversation Ortiz testified that he was present for. (S.H.Tr.:64-65).  Finally, there is no explanation in the state writ record why Blanford did not testify at the writ hearing or why no deposition was taken of him.  As a result, the record contains only a vague statement from Blanford about the Grahams acknowledging that a fall occurred that was not subject to cross-examination.

Had trial counsel questioned these three witnesses on the subject of the fall from the porch, it appears from the record that the three witnesses would have provided three separate and inconsistent stories about what had occurred.  Moreover, contrary to petitioner's assertions, these three witnesses were not disinterested third parties in this case who could have testified free from any allegations that they were biased in favor of petitioner.  All three of them were friends of petitioner's from her church.  (R. 7:30; R. 8:55, 62, 66, 68).  Ortiz had known petitioner for four or five years prior to meeting the Graham family, Blanford introduced petitioner to Darren and was

Darren's boss (R. 7:32; R. 8:58), and Ricosi displayed animosity towards Marsha Graham and a bias towards petitioner both at trial and at the writ hearing.  Given that Ricosi's writ testimony is not credible, that Ortiz' deposition testimony conflicts with both Ricosi's testimony and Blanford's affidavit, and that Blanford's affidavit contains one vague statement regarding the fall, the record supports the state habeas court's conclusion that petitioner's trial counsel was not ineffective in failing to question these witnesses about the fall.

> b.    *Prejudice*

Petitioner has also failed to show that, had these three witnesses been questioned on this issue, there is a reasonable probability that she would not have been convicted of capital murder. While it was crucial to the petitioner's defense that the jury believe that a fall from the Grahams' porch was the cause of D.G.'s first fracture, it was not crucial for the State to disprove that the first fall occurred at the Grahams' house.  The State took the position that the first fall did not occur at the Grahams' house because this fall was not mentioned at the hospital or to the police at any point during the investigation; it was not reported to the police until several months later.  The State also presented evidence that the porch was thirteen inches from the ground.  Medical experts testified that it would be rare for a skull fracture to occur from an accidental fall, that the location on D.G.'s skull that was fractured was a more difficult location to fracture and was more likely from an intentional act, and that injuries tend to escalate over time in child abuse cases.  (R. 4:69, 78, 109; R. 5:29-31; R. 5:218; R. 7:181).  The State also elicited testimony from all of their medical experts that the initial skull fracture was not the cause of D.G.'s death.  (R. 3:104, 119-23; R. 4:77, 79-80, 85-6; R. 5:221-22; R. 7:191-93; R. 9:29, 31, 66-7).  None of the affidavits or the testimony from Ricosi, Blanford, and Ortiz refer to anything but D.G. *falling* from the Grahams' thirteen-inch high porch. Milton Graham's testimony seemed to suggest that the fall might have been caused by Marsha Graham's anger.  (R. 8:40.)  Even where viewed in the light most favorable to the defense, the trial testimony and the evidence at the state writ level indicated was that D.G. lost her breath and was still for a view moments after this fall from the porch, but she lived for eight more days without losing

consciousness.  During that time she walked, ran, talked, ate, went to day care and went to church, played with toys, and sang a song to the nurse who saw her on February 5.  (R. 5:168; R. 6:147-49, 242-44; R. 8:24-5, 55, 68).  All of the State's experts testified that, had D.G. been seriously injured in the prior fall, she would not have be able to do these things.  (R. 3:119-23; R. 4:91-2; R. 5:98, 221; R. 7:181-82; R. 9:29).  The defense's case depended not only on the jurors believing that a fall from a low porch actually occurred on January 27 (even though this fall was never mentioned during the initial investigation of the case), but that it caused a skull fracture that in turn caused D.G.'s death eight days later (although she did not exhibit symptoms severe enough that anyone took her to the doctor any earlier).

During closing statements, the lead prosecutor argued that petitioner initially tried to blame the grandmother for the death because she was the last person who was with D.G. before petitioner gave her a bath, that Ricosi reported the fall at the Grahams' house that occurred on February 5, and that the story later grew from that. (R. 10:9-11).  She then argued that while she could not disprove that the fall occurred at the grandmother's house, the credibility of the witnesses indicated that it did not, and she later argued that it was a reasonable deduction from the evidence that petitioner knew about the prior injury because she caused it some prior night when D.G. stood up in the tub. (R. 10:11-12, 18).  The prosecutor then went on to argue at length that the credible medical testimony showed that the fracture that D.G. received on February 5 was the one that killed her, that petitioner had been lying about that evening from the beginning, and that the defense medical experts who testified that the first fracture was the caused of death were not credible. (R. 10:59-73).  The prosecutor argued that Marsha Graham did not hurt D.G., but even if she had, and even if the fall occurred on January 27 as the defense contended, it was not what killed D.G.  Had Marsha gone so far as to smash her head on those steps, serious trauma would have occurred then, and D.G. would not be walking around with minor symptoms.  (R. 10:73-4).  The prosecutor then argued that in order to believe that petitioner had nothing to do with the death, the jurors would have to believe that she only tapped D.G. on the head, which was not medically reasonable.  Finally, the prosecutor

argued that the impact that killed D.G. occurred on February 5, that it happened by petitioner's conduct, that it was at such a force that it caused D.G.'s skull to fracture multiple times, that it was not caused by a slip and fall, and that no prior fracture contributed to it.  (R. 10:84-5).

The bulk of medical expert testimony presented at trial supported the State's argument. Defense expert Dr. DiMaio testified that he believed that it was a serious injury that caused D.G.'s death, but disagreed on when the injury occurred.  Only *one* of the seven medical experts who testified at trial gave the opinion that an accidental fall from a porch could have caused D.G.'s death. Given the limited value of inconsistent stories about the prior fall from witnesses with a bias towards petitioner, the record reflects no reasonable probability that testimony from Blanford, Barbara Ortiz, and Ricosi about the fall at the Grahams' house would have changed the outcome of petitioner's trial.  Petitioner has therefore failed to prove either prong of the *Strickland* standard on this claim.

**B.**     **Failure to Call Witnesses about D.G.'s Behavior and Relationship with Petitioner**

Petitioner next contends that her attorney was ineffective for failing to call two additional witnesses who could have testified regarding D.G.'s behavior in the days before her hospitalization and death and could have testified about petitioner's relationship with D.G.

At the writ hearing, Kelly Jackson testified that she is petitioner's best friend, went to church with her, and worked with her.  She testified that petitioner loved D.G., and that she saw petitioner interact with D.G. several times in a loving, interactive, and attentive manner.  She visited petitioner's apartment on the Saturday before D.G. went to the hospital, and D.G. seemed really tired, kind of out of it, failed to make eye contact, and would bob her head a lot.  D.G. would also rub the back of her head.  She testified that she met with petitioner's attorney, gave him this information, and was at the courthouse prepared to testify but was not called as a witness. (S.H.Tr.:195-202).  Finally, Mrs. Jackson testified that petitioner mentioned earlier that week that D.G. appeared sick, but no one took her to the doctor until the following Monday. (S.H.Tr.:203-07).

Wesley Jackson testified at the writ hearing that he is Kelly Jackson's husband and also a friend of petitioner.  According to him, petitioner treated D.G. as a mother would treat her child, and

she seemed to care for her.  He saw D.G. at petitioner's apartment the week before her death and she seemed like she did not feel right.  He was present at trial and available to be called as a witness but was not.  (S.H.Tr.:211-13).  On cross-examination, Mr. Jackson testified that he visited petitioner about five days before D.G. went to the hospital and that petitioner told him that D.G. had gone to the doctor and been diagnosed with a double ear infection.  (S.H.Tr.:214-15).[4]

Petitioner's attorney testified that other people testified at trial about D.G.'s lethargic behavior in the week prior to her death. (S.H.Tr.:240-41).

Based on the affidavits and live testimony, the trial court denied this claim on its merits.  The state court's denial if this claim is not contrary to federal law.  As noted by petitioner's trial attorney at the state writ hearing, several witnesses testified at trial about D.G.'s lethargic behavior in the week prior to her death, including D.G.'s babysitter, and the minister and several members of the church, who all testified that she was appeared unusually tired, withdrawn, and quiet. (R. 6:242-43; R. 8:24-5, 55, 63, 68).  D.G.'s babysitter also testified at trial that D.G. vomited at her house two times during the week before her hospitalization, that she informed petitioner about this, and that she was told that D.G.'s grandmother was taking her to the doctor. (R. 6:243, 258-60).  It was also undisputed amongst the medical experts who testified at trial that D.G. suffered an earlier skull fracture and would experience symptoms from this fracture.  Therefore, any testimony from the Jacksons regarding D.G.'s behavior in the week prior to her death would not only be cumulative of testimony already presented at trial, but it would be cumulative testimony in support of an issue that was never disputed at trial–that D.G. had experienced a prior skull fracture a week or two prior to her death.  Petitioner's defense attorney was not deficient for failing to present cumulative testimony on an issue not in dispute.

Regarding petitioner's relationship with D.G., a number of people also testified at trial that petitioner was affectionate and had a good relationship with D.G., including D.G.'s babysitter,

---

[4]  D.G. did not have a medical appointment until the following Monday, February 5, when she was diagnosed as having ear infections.

petitioner's parents, and several church members. (R. 6:241; R. 8:23-4, 29-30, 53, 61-2, 67, 217, 224). Accordingly, any testimony from the Jacksons would also have been cumulative of this testimony already offered at trial. Petitioner has failed to show either that counsel was deficient for failing to present cumulative evidence or that this failure prejudiced her case.

In conclusion, petitioner has failed to establish that her trial counsel was ineffective for failing to question certain witnesses further or for failing to call additional witnesses. Her ineffective assistance of trial counsel claim should be denied.

## V. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In her first ground, petitioner also contends that appellate counsel was ineffective for failing to raise as a ground for relief on appeal that the trial court erred in failing to suppress the statements petitioner gave to the police on February 9, 2001, and for failing to adequately argue that the evidence was factually and legally insufficient to support the conviction.

The federal constitution also guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Whether appellate counsel has been ineffective is also determined by using the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, petitioner must show a reasonable probability that but for his counsel's deficient representation, he would have prevailed on his appeal. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

To render effective assistance of counsel, appellate counsel need not raise every non-frivolous issue on appeal. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). "Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Williamson*, 183 F.3d at 462-63 (footnote and citations omitted). To determine whether appellate

counsel was deficient, the Court thus must consider whether the omitted challenge "would have been sufficiently meritorious such that [the attorney] should have raised it on appeal." *Phillips*, 210 F.3d at 348.

In this case, the trial court found that appellate counsel filed a brief raising twenty-four grounds for relief, that the motion to suppress was properly denied following a pre-trial hearing, and that counsel was therefore not ineffective for failing to raise a meritless issue. The trial court also found that counsel adequately raised legal and factual challenges to the sufficiency of evidence on direct appeal and concluded that petitioner had failed to prove a deficiency or prejudice. (S.H.Tr.:345-46). This conclusion is a reasonable application of the *Strickland* standard.

With regard to the failure to raise as an issue the denial of the motion to suppress, petitioner points to testimony that she gave during trial regarding the statements. (Mem. at 73-4). Petitioner did not testify at the pre-trial hearing, however, so her testimony could not have been considered by the trial court in reaching its decision to deny the motion. Petitioner further contends that certain statements she made that any fall by D.G. was an accident were not included in her statements and that the police officers purposely did not include these statements. To the contrary, the testimony at the pre-trial hearing showed that petitioner's statements were written in her own handwriting, not by the police. (Hearing, vol. 2, pp. 25-36; vol. 3:12-17). Although petitioner argues that she was "confined" in a small room and not permitted food or restroom breaks, these claims are contradicted by the testimony given by the police officers at the hearing. The evidence showed that petitioner received in writing her *Miranda* warnings, which she initialed, and she subsequently wrote out her February 9 statements herself. She was given breaks if needed, and the officers discussed the case with her and confronted her with what the initial autopsy results revealed, but she chose what to put in her statements. (Hearing, vol. 2, pp. 19-36, 55-66). Counsel was therefore not ineffective for failing to raise on appeal that petitioner's statements were involuntary and should have been suppressed. *See United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (holding that attorneys do not render deficient representation by failing to present meritless claims on appeal).

With regard to petitioner's assertion that appellate counsel was ineffective for failing to effectively argue that the evidence was legally and factually insufficient to support the conviction, the only support petitioner offers for this assertion is her own separate analysis that the evidence presented at trial to support the conviction was "non-existent." (Mem. at 74).  Petitioner further asserts, without support, that the inadequate argument presented on appeal on this issue resulted in a denial of full review by the appellate court.  The record shows that the Texas appellate court considered these points of error and determined that the evidence was factually and legally sufficient. *Logan-Gates*, slip op. at 19-20.  In reaching this decision, that court noted that the jury, in its function as the sole judge of the credibility of the witnesses, was free to believe the testimony of the State's medical experts and disbelieve the defense experts. *Id.*  Petitioner has not shown that appellate counsel was ineffective for failing to *better* argue these points of error.

Petitioner's claim of ineffective assistance of appellate counsel should also be denied.

## VI.  JURY PANEL

In her second ground for relief, petitioner asserts that she was denied the right to an impartial jury selected from a fair cross-section of the community in violation of the Sixth and Fourteenth Amendments because the venire did not adequately represent the Hispanic population of Dallas County.  Respondent contends that this ground for relief is both procedurally barred and without merit because at the state habeas level, the trial court found that petitioner did not raise this issue until her motion for new trial and that she had waived any error on collateral review by failing to object to the jury venire at trial.  (*See* S.H.Tr.:347).

**A.**  **Procedural Bar**

The Supreme Court has held that when a state prisoner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law *or* that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To satisfy

the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995). The Fifth Circuit has held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a claim. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999). The Court of Criminal Appeals has also ruled that an objection at trial is need to preserve even constitutional errors for appellate review. *See Allridge v. State*, 850 S.W.2d 471 (1991). Because petitioner's second ground for relief was denied at the state level on the basis of an independent and adequate state ground, she is procedurally barred from raising this ground for relief unless she can show either cause and prejudice or that the failure to consider the claims on the merits would result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750; *Jones*, 171 F.3d at 277.

Petitioner essentially argues that she has met one of these exceptions because her trial attorney did not have the factual information to object to the racial composition of the jury venire because studies on this issue had not yet been conducted. (Mem. at 84-86). Alternatively, she contends that if this ground is procedurally barred, her attorney was ineffective for failing to make the objection at trial. The Court need not determine whether petitioner has established an exception to the procedural bar because even so assuming, this ground fails on the merits.

**B.   Under-representation Claim**

The Supreme Court has held that the Sixth Amendment right to a jury trial requires that the jury be selected from a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975). Therefore, jury venires must not systematically exclude distinctive groups in the community. *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979). In order to establish a *prima facie* Sixth Amendment fair cross-section violation, one must show that: 1) the group that was alleged to have been excluded is a distinctive group in the community; 2) the representation of this

26

group in venires from which juries are selected is not fair and reasonable in relation to the number of this group in the community; and 3) this under-representation is due to systematic exclusion of the group in the jury selection process. *Id*. at 364.

As support for her claim of systematic exclusion of Hispanics, petitioner points to a study done in another Dallas County case in which a statistician determined that based on the 2000 census and identification of Hispanics through self-identification, surname, and surname adjusted for intermarriage rate, the adult population of Dallas County is 26.4% Hispanic and 14.1% Hispanic citizens of the United States. (Mem. at 79-80). The proportion of the venire that was Hispanic in that case was 12.2%. (*Id.*) Petitioner also notes a study conducted by the Dallas Morning News and the SMU law review which determined that in one week in March of 2000, there was a substantial under-representation of Hispanics and young adults in the Dallas County jury venire because Hispanics were 23% of the population but only 9% of the venire, and Dallas adults between the ages of eighteen and thirty-four were 37% of the population but only 8% of the venire. (*Id.* at 81-82). She further argues that in another Dallas County case, the Dallas County Jury Services manager testified that she believed that two factors contribute to potential jurors not reporting to jury service. The first is low pay and the second lack of enforcement of summons after a failure to report. (*Id.* at 82). Petitioner claims that these factors affect poor people disproportionately and therefore affect Hispanics and young people disproportionately. (*Id*. at 83).

At the state habeas level, the trial court concluded that petitioner had failed to prove her fair cross-section claim. Specifically, the trial court found that petitioner had failed to prove the second prong of *Duren* because she had failed to present evidence that the number of Hispanics in jury venires is not fair or reasonable when compared to the Hispanic population of Dallas County that is qualified for jury service under Texas law. (S.H.Tr.:347-49). The trial court further found that petitioner had failed to present evidence that Hispanics are systematically excluded from Dallas County venires and had thus failed to prove the third prong of the *Duren* test. (S.H.Tr.:351-56).

This conclusion is not an unreasonable application of federal law because petitioner has failed to establish a *prima facie* Sixth Amendment violation. While there is no dispute as to the first *Duren* prong that Hispanics are a distinctive group in the community, *see Castaneda v. Partida*, 430 U.S. 482 (1977), petitioner has failed to meet the other two requirements of a *prima facie* Sixth Amendment violation. Even assuming that the studies petitioner cites are correct and applicable to the her jury venire, she has cited to statistics indicating that the number of Hispanics in Dallas County jury venires was lower relative to the number of Hispanics in the community per the 2000 Census. Petitioner has not, however, established whether Hispanics are under-represented on jury venires when the number of Hispanics in venires is compared with those Hispanics in the community who are qualified for jury service. The Fifth Circuit has held that this is the appropriate comparison when addressing the second prong of the *Duren* test.[5] *See Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996); *United States v. Brummit*, 665 F.2d 521, 529 (5th Cir. 1981).

Moreover, petitioner has not established the third *Durden* requirement that there be systematic exclusion of the group *in the jury selection process*. Under Texas law, Dallas County residents placed on the "jury wheel" are taken from the list of those registered to vote in the county and from the list of all persons with a driver's license or a state identification card, so long as they are not already disqualified. TEX. GOV'T CODE ANN. § 62.004(a) (Vernon 1998). The Fifth Circuit has held that the use of the voter registration list as the sole source of potential jurors does not violate the Sixth Amendment. *United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976). Therefore, Texas' use of both the voter registration list and the list of all persons with a driver's license or state identification card is not an inherently exclusive method of selection. A failure to

---

[5]    Under Texas state law, a person is not *disqualified* from jury service in Dallas County if he or she is over the age of eighteen, a citizen of both Texas and Dallas County, and does not have any prior felony conviction on his or her record. TEX. GOV'T CODE ANN. § 62.004(a) (Vernon Supp. 2004).

report to jury service does not equate to systematic exclusion of Hispanics from jury venires.[6] While low pay and a failure to enforce summons may suppress juror turnout, petitioner has failed to show that this is a systematic exclusion of Hispanics, as opposed to any other group of potential jurors.

In conclusion, even if this claim is not procedurally barred, petitioner has not shown that she is entitled to relief.[7]

## VII. NO EVIDENCE

Finally, in her third ground for relief, petitioner asserts that there was no evidence to support her conviction for capital murder. In particular, she claims that there was no evidence presented at trial showing that she committed any act that caused the injury leading to D.G.'s death. Accordingly, she contends, her due process rights were violated.

A claim that "no evidence" supports a conviction is the same as a challenge to the legal sufficiency of the evidence. *See Haley v. Cockrell*, 306 F.3d 257, 266-67 (5th Cir. 2002) (noting that a claim of "no evidence" is the same as a claim of insufficiency of the evidence), *vacated on other grounds*, 541 U.S. 386 (2004); *United States v. Jackson*, 86 Fed. App'x 722, 722 (5th Cir. 2004) (per curiam) (applying insufficiency-of-the-evidence analysis to claim of "no evidence"). "A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense." *Foy v. Donnelly*, 959 F.2d 1307, 1313 (5th Cir. 1992). Federal courts have extremely limited habeas review of claims based on the sufficiency of the evidence, and the standard for reviewing such claims is supplied by *Jackson v. Virginia*, 443 U.S. 307 (1979). When reviewing such claims against the underlying

---

[6]   Petitioner has presented no evidence concerning the percentage of summoned jurors, including Hispanic jurors, who do not report based on exemptions. Under Texas law, a potential juror may claim an exemption from jury service and not report for service if he or she: 1) is over seventy-years old; 2) has legal custody of a child under ten that would be left without adequate supervision; 3) is a high school or college student; 4) has served on a jury within the past two years; 5) is the primary caretaker of an invalid; or 6) is a member of the military on deployment. TEX. GOV'T CODE ANN. §§ 62.106(a), 62.107(a) (Vernon 2003).

[7]   Because this Court has determined that this ground for relief is without merit, petitioner's trial counsel was also not ineffective for failing to make a meritless objection to the composition of the jury venire at the time of trial. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

conviction, the relevant question "is whether, after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. When "faced with a record of historical

facts that supports conflicting inferences [courts] must presume – even if it does not affirmatively

appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution,

and must defer to that resolution." *Id.* at 326. Further, under *Jackson*, "the assessment of the credi-

bility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330

(1995). "Determining the weight and credibility of the evidence is within the sole province of the

jury." *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992). Courts view "any required

credibility determinations in the light most favorable to the guilty verdict." *United States v. Wise*,

221 F.3d 140, 154 (5th Cir. 2000). They do not "second-guess[] the weight or credibility given the

evidence." *United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999). The *Jackson*

standard applies whether the evidence is direct or circumstantial. *United States v. Scott*, 159 F.3d

916, 920 (5th Cir. 1998).

In reviewing a challenge to the sufficiency of the evidence supporting the underlying

conviction, "*Jackson* requires . . . that the review occur 'with explicit reference to the substantive

elements of the criminal offense as defined by state law.'" *Bledsue v. Johnson*, 188 F.3d 250, 259

(5th Cir. 1999) (quoting *Jackson*, 443 U.S. 324 n.16). The federal courts must "independently

analyze the governing statute, the indictment, and the jury charge to measure the constitutional

sufficiency of the evidence and determine what are the *essential elements* required by the *Jackson*

sufficiency inquiry." *Id.* at 260. When considering a claim of insufficient evidence to support the

underlying conviction on federal habeas review, this Court should only determine "whether the

evidence was constitutionally sufficient to convict [petitioner] of the crime charged." *Id.* at 262

(quoting *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991)).

At the state habeas level, the trial court found that D.G. was in the sole custody of petitioner

at the time she received her fatal injuries and that petitioner lied to the EMTs and the hospital

personnel about how the injuries occurred.  The record contains the testimony of Dr. Duval, Dr. Persaud, Dr. Alexander, and Dr. Dolinak, who all determined that D.G. died as the result of high impact blunt trauma causing severe brain damage which occurred on February 5, 2001.  The state habeas court also found that the jury was free to believe this expert testimony and reject the testimony of Dr. Plunkett and Dr. DiMaio that the cause of death was the prior injury, and that there was evidence presented at trial to support the conviction.  Accordingly, the state habeas court concluded that this ground was without merit. (S.H.Tr.:358-59).  This conclusion is not contrary to federal law.

In the indictment against petitioner, the State alleged that petitioner knowingly caused the death of D.G. by either causing D.G. to strike an object or by striking D.G. on an object.  The indictment also listed the possible objects as being a bathtub, a floor, a soap dish, a wall, a door, or some unknown object. (Tr.:2).  The jury charge instructed the jury that a person acts knowingly, or with knowledge, with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. (Tr.:87).  The indictment instructed the jury that if they believed from the evidence beyond a reasonable doubt that petitioner knowingly caused the death of D.G. by causing her to strike or by striking her on an object and that D.G. was under six years of age, they should find petitioner guilty of capital murder. (Tr.:95).

There was testimony presented from medical experts that the cause of D.G.'s death was a non-accidental blunt trauma injury that occurred immediately prior to her losing consciousness and not several days earlier (R. 4:92, 109, 129-31, 214-21), that D.G. was in petitioner's sole custody prior to losing consciousness (R. 8:112-26), that D.G. was twenty-three months old when she died (R. 3:75), and that petitioner lied to authorities on more than one occasion about what happened to D.G. that evening (R. 3:53, 249, 254-55; R. 4:212).  Viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt.  While there was medical expert testimony presented by the defense that the prior skull fracture that D.G. sustained was the actual cause of her death, the weight and

credibility of the evidence was within the sole province of the jury, and the jury was therefore free to resolve this conflicting testimony in favor of the prosecution.

Petitioner's third ground for relief is therefore without merit and should be denied.

## VIII.  EVIDENTIARY HEARING

Upon review of the pleadings filed herein and the proceedings held in state court as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## IX.  RECOMMENDATION

The Court should **DENY** with prejudice the request for habeas corpus relief brought pursuant to 28 U.S.C. § 2254.

**SIGNED on this 27th day of August, 2009.**

_Irma Carrillo Ramirez_
**IRMA CARRILLO RAMIREZ**
**UNITED STATES MAGISTRATE JUDGE**


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE